AO 91 (REV.5/85) Criminal Complaint  AUSAs Sunil Harjani and Christopher Grohman (312) 469-6132

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED
MAR - 9 2012
THOMAS G BRUTON
CLERK, U S DISTRICT COURT

UNITED STATES OF AMERICA

v.

VICTORIA JABER and
CHADIA ABUEID

CRIMINAL COMPLAINT

CASE NUMBER:

MAGISTRATE JUDGE FINNEGAN

UNDER SEAL

12 CR 172

I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief:

### COUNT ONE

Beginning not later than in or about December 2010 and continuing until in or about February 2012, at Hickory Hills and elsewhere, in the Northern District of Illinois, Eastern Division, VICTORIA JABER and CHADIA ABUEID, defendants herein, conspired to (1) knowingly purchase and possess contraband cigarettes, namely in excess of 10,000 cigarettes which bear no evidence of the payment of the applicable taxes of the State of Illinois and the County of Cook, Illinois, in violation to Title 18, United States Code, Section 2342(a), and (2) possess and sell counterfeited tax stamps, which are part of or constitute interstate commerce, knowing that the stamps have been counterfeited, in violation of Title 18, United States Code, Section 2315;

In violation of Title 18, United States Code, Section 371.

### COUNT TWO

On or about September 15, 2011, at Hickory Hills, in the Northern District of Illinois, Eastern Division, VICTORIA JABER, defendant herein, knowingly and intentionally distributed a controlled substance, namely, a quantity of a mixture and substance containing a detectable quantity of cocaine, a Schedule II Narcotic Drug Controlled Substance;

In violation of Title 21, United States Code, Section 841(a)(1).

I further state that I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives, and that this complaint is based on the facts contained in the Affidavit which is attached hereto and incorporated herein.

_____
Signature of Complainant
DANIEL DURKIN
Special Agent, ATF

Sworn to before me and subscribed in my presence,

March 9, 2012                            at    Chicago, Illinois
Date                                            City and State

SHEILA FINNEGAN, U.S. Magistrate Judge          _____
Name & Title of Judicial Officer                Signature of Judicial Officer

STATE OF ILLINOIS   )
                    )  SS
COUNTY OF COOK      )

## AFFIDAVIT

I, Daniel Durkin, Special Agent, Bureau of Alcohol, Tobacco, Firearms, and Explosives, having been duly sworn, state as follows:

**Background**

1. I am a Special Agent with the Bureau of Alcohol, Tobacco and Firearms and Explosives ("ATF") and have been so employed for 10 years. I am currently assigned to the Chicago Field Division, specifically at the ATF Downers Grove Field Office. I have participated in investigations involving violations of federal criminal laws, including but not limited to, the possession and distribution of contraband cigarettes in violation of Title 18, United States Code, Section 2342(a). I have also received special training in the enforcement of laws and methods of investigation, including but not limited to, investigative techniques, undercover cooperation, informant development and handling, physical and electronic surveillance, and debriefing defendants, witnesses, and informants. Through my training and experience, I have also become familiar with the methods used by individuals purchasing and distributing contraband cigarettes.

2. The information in this affidavit is based on my personal knowledge, information provided to me by other law enforcement agents and in law enforcement records, information provided by confidential sources, review of consensually recorded conversations, and my training and experience as well as the training and experience of other law

enforcement agents.

3. This investigation included the use of consensually recorded telephone calls and audio/video recorded meetings. The summaries of recorded conversations in this affidavit do not include reference to all of the topics covered during the conversations. In addition, the majority of the conversations and meetings described herein were conducted in the Arabic language, and ATF agents have retained an Arabic translator to translate and partially transcribe the recordings. The translator is fluent in Arabic, and has 5 years of translation experience from Arabic to the English Language.

4. Furthermore, quoted material from the recorded conversations as set out in this affidavit is taken from draft summaries and transcriptions, not final transcripts. In addition, the summaries do not included reference to all statements made by the speakers on the topics described by the speakers. In some of the paragraphs describing the recordings below, my interpretations of the discussion are included in brackets. These interpretations include meanings attributed to code words, coded language, or vague references used by speakers. My understanding and interpretation of the conversations is based upon the contents of the conversations, information provided by the confidential sources, the context of both prior and subsequent recorded conversations, my knowledge derived from this investigation, and my experience and familiarity, and the experience and familiarity of other law enforcement agents, with the trafficking of contraband cigarettes.

5. I submit this affidavit in support of a criminal complaint alleging that, between in or about December 2010 and in or about February 2012, VICTORIA JABER ("JABER") and CHADIA ABUEID ("ABUEID") conspired to (1) purchase and possess contraband cigarettes, namely in excess of 10,000 cigarettes which bear no evidence of the payment of the applicable taxes of the State of Illinois and the County of Cook, Illinois, in violation of Title 18, United States Code, Section 2342(a), and to (2) possess and sell counterfeit tax stamps, in violation of Title 18, United States Code, Section 2315; all in violation of Title 18, United States Code, Section 371 (Count One); and that, on or about September 15, 2011, JABER knowingly and intentionally distributed a controlled substance, namely, a quantity of a mixture and substance containing a detectable quantity of cocaine, a Schedule II Narcotic Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1) (Count Two). Since this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include each and every fact known to me concerning this investigation.

6. Illinois law, along with county and city ordinances, regulate the distribution of cigarettes. Distributors or wholesalers of cigarettes must apply for and receive a license from the Illinois Department of Revenue pursuant to Illinois law. These distributors must also purchase tax stamps from the State of Illinois and affix those stamps to the cigarette packs before sale to retail outlets. The Illinois Cigarette Tax Act requires taxes to be paid on each pack of cigarettes which must be evidenced by revenue tax stamps affixed to each pack of

cigarettes. 35 ILCS 130/3, 135/3. In addition, licensed distributors who sell cigarettes in Cook County must also purchase and affix tax stamps to cigarette packets that they sell. Cook County, Code of Ordinance, Chpt. 74, Art. XI, Sec. 74-433, 74-435. The tax stamps are affixed to the side or the bottom of each cigarette packet as evidence that the applicable state and county taxes have been paid in full. Cigarettes packets that bear no evidence of tax stamps are commonly called "unstamped" cigarettes. Pursuant to 18 U.S.C. § 2341(2)(c), only certain categories of individuals are permitted to possess, purchase, or sell unstamped cigarettes, namely, licensed manufacturers and exporters, a common or contract carrier transporting cigarettes with a proper bill or landing or freight bill, an individual licensed by the State who has complied with the accounting and payment requirements relating to the cigarettes involved in the transaction, and agents of the United States and the 50 states in connection with their official duties.

7. Cigarettes are commonly retailed in packs, which contain 20 cigarettes per pack. At the wholesale level, cigarettes are commonly sold in cartons (10 packs per carton) that are bundled in master cases (60 cartons to a case). Accordingly, 10,000 cigarettes are contained in 500 packs, 50 cartons or 5/6 of a master case.

8. Based on my training and experience, licensed cigarette distributors use a machine that cut open master cases and cartons of boxes and affixes the stamp on to the cigarette packets. However, the master cases and cartons sold to the targets of the investigation bear no evidence of having been cut open and are sealed boxes.

9. Since March 2010, two Cooperating Sources (CS1 and CS2) have sold unstamped cigarettes to a number of targets in the Chicagoland area. The confidential sources have been acting under the direction of ATF agents, including myself, and have consensually recorded their telephone conversations and in-person meetings with these targets. In addition, starting in October 2010, the vast majority of sales of unstamped cigarettes to the targets have occurred at a warehouse operated by ATF agents (hereinafter "the undercover warehouse"). Cameras within the undercover warehouse have captured audio and video recordings of all meetings between CS1 and CS2 and the targets of the investigation, and ATF agents have monitored these meetings in real-time.

10. CS1 first began cooperating with the FBI in 2005 after having been indicted for fraud. CS1 has since pled guilty to that crime and has a plea agreement which provides that the government anticipates recommending a reduced sentence in exchange for CS1's full and truthful cooperation. CS1 has assisted law enforcement in other investigations, and has testified for the government in two different trials. CS1 has been paid for his services and investigative expenses for both his participation in other investigations and his participation in the ATF undercover unstamped cigarette distribution operation that is the subject of this affidavit.

11. CS2 first began cooperating with the FBI in 2005 after having been indicted for fraud. CS2 has also pled guilty but he does not presently have a plea agreement with the government. CS2 is cooperating in the hopes of receiving a reduced sentence. CS2 has also

assisted law enforcement in other investigations. CS2 has been paid for this services and investigative expenses for his participation in the ATF undercover unstamped cigarette operation.

12. CS1 and CS2 have provided timely and reliable information concerning the illegal activities identified below. A substantial portion of CS1's and CS2's information has been corroborated by independent investigation, including physical surveillance and consensually recorded telephone calls and in-person meeting.[1]

13. On or about February 15, 2012, ATF agents confirmed with the Illinois Department of Revenue that JABER and ABUEID are not licensed with the State of Illinois or the County of Cook to possess or distribute cigarettes, and have never held any permit that allows them to possess unstamped cigarettes.

14. The following is a description of eleven controlled purchases of unstamped cigarettes and/or sale of counterfeit tax stamps by JABER and ABUEID, four controlled purchases of cocaine from JABER, as well as other meetings. In total, JABER and ABUEID conducted 26 transactions with CS1 and/or CS2, and JABER and ABUEID paid over

---

[1] The identifications of JABER and ABUEID and their voices in this affidavit is based on one or more of the following. First, agents have been able to identify the defendants' voiced because these voices have been recorded multiple times via consensually recorded telephone calls and meetings. Second, the defendants also appeared at meetings and were captured on video and observed real-time by agents watching the video surveillance on monitors. Agents compared the persons on the video with driver license photographs of defendants and confirmed the identity of the defendants. Third, agents also compared the voices of defendants captured on consensually recorded telephone calls to the voice captured on in-person video recorded meetings and confirmed the identity of the speakers in that manner.

6

approximately $291,000 to CS1 and CS2 in exchange for over approximately 2.8 million unstamped cigarettes. Additionally, in total, JABER distributed approximately 4.9 kilograms of cocaine to CS1.

**Transactions**

**A.    December 29, 2010: Meeting Between CS1 and JABER**

15.    On or about December 29, 2010, CS1 and JABER met at a Dunkin' Donuts restaurant in Chicago, Illinois. This meeting was recorded with both audio and video. According to CS1, during this meeting, JABER told CS1 that she could sell CS1 fictitious Illinois Tax Stamps. According to CS1, JABER told CS1 that she would have these tax stamps in her possession in approximately one month and one week. According to CS1, JABER offered to sell these stamps to CS1 for 30 cents each, in bundles of 30,000 at a time ($10,000). According to CS1, JABER told CS1 that the stamps were shipped through New York to Miami, and then to a black neighborhood in Chicago where she picks them up.

**B.    January 20, 2011: Down Payment to JABER and ABUEID for Counterfeit Tax Stamps**

16.    On or about January 19, 2011, CS1 placed a consensually recorded call to JABER. On this call, JABER agreed to give Illinois tax stamps to CS1 in exchange for $2,200 and 100 cartons on unstamped cigarettes. On this call, CS1 and JABER agreed to meet on January 20, 2011 to conduct this transaction.

17.    On or about January 20, 2011, CS1 met with JABER and ABUEID in a store parking lot in Hickory Hills, Illinois. ATF agents provided CS1 with $2,200 and 100 cartons

of unstamped cigarettes prior to the meeting with JABER and ABUEID. This meeting was recorded with both audio and video. Agents observed JABER and ABUEID arrive at the parking lot in a red Chevrolet Traverse, registered to ABUEID. Agents observed CS1 and JABER converse outside of the car. Agents then observed JABER take the 100 cartons of untaxed cigarettes and put them inside ABUEID's vehicle, while ABUEID waited in the car. Agents observed CS1 and JABER enter CS1's vehicle and converse for a short period of time before both departed the area. At this time, as captured by the recording device, CS1 paid JABER $2,200. According to CS1, this money, along with the 100 cartons of untaxed cigarettes, was a prepayment for counterfeit Illinois tax stamps, which JABER told CS1 would be arriving in approximately three weeks. According to CS1, JABER explained that the fictitious tax stamps came on a sheet and that CS1 would have to peel them off of the sheet to place on to the cigarette packets. According to CS1, during this conversation, JABER also told CS1 that she had been arrested for robbery and also offered to sell CS1 cocaine.

18. I have reviewed the transcript of the recording of this meeting with JABER and ABUEID. The recording confirmed the payment of $2,200 and 100 cartons of untaxed cigarettes as down payment for counterfeit tax stamps. The transcripts also confirms the information provided by CS1.

### C. March 8, 2011: ABUEID's Purchase of Unstamped Cigarettes and Provision of Counterfeit Tax Stamps

19. On or about March 8, 2011, ABUEID arrived at the undercover warehouse in the red Chevrolet Traverse. This meeting was recorded with both audio and video. ATF agents had previously provided CS1 with 325 cartons of unstamped cigarettes. During this meeting, according to CS1, CS1 and CS2 sold ABUEID 235 cartons of unstamped cigarettes. According to CS1, in exchange, ABUEID gave CS1 and CS2 $11,310 and a sample of 6 counterfeit New Jersey tax stamps. CS1 and CS2 gave these stamps, and the $11,310, to ATF agents after ABUEID departed the undercover warehouse.

20. I have reviewed the transcripts of this recorded meeting with ABUEID. The recording confirmed the sale of the 235 unstamped cigarette cartons to ABUEID. During this meeting, ABUEID, CS1, and CS2 discussed both the quantity and price for ABUEID's purchase of the unstamped cigarettes. During this meeting, ABUEID stated, "I will bring you the other stamps next time, this is from New Jersey." ABUEID later stated, "my goal is to bring you customers from outside – New York, New Jersey, and you sell and give me my commission." ATF agents confirmed that the stamps that JABER and ABUEID sold to CS1 were counterfeit by comparing them to known stamps and noting several differences. Among other things, known stamps have individual serial numbers and come in rolls, whereas the counterfeit stamps all bore the same serial number and came in sheets.

### D. March 17, 2011: JABER and ABUEID's Purchase of Unstamped Cigarettes and Sale of Counterfeit Tax Stamps

21. On or about March 17, 2011, JABER and ABUEID arrived at the undercover warehouse. This meeting was recorded with both audio and video. ATF agents had previously provided CS1 with 345 cartons of unstamped cigarettes. According to CS1, during this meeting, JABER and ABUEID negotiated the purchase of 345 cartons of unstamped cigarettes in exchange for $12,330. According to CS1, ABUEID paid CS1 $9,330 in cash for these cartons of cigarettes, and JABER paid CS1 with $3,000 worth of counterfeit Illinois tax stamps. According to CS1, ABUEID then told CS1 that, at first, she sold the cigarettes to customers in New York for $28 per carton, and later she sold them for $30 per carton. After the meeting, CS1 and CS2 provided the counterfeit tax stamps and $9,330 in cash to ATF agents.

22. I have reviewed the transcripts of the recorded meeting with JABER and ABUEID. The recording confirmed the sale of the unstamped cigarette cartons to JABER and ABUEID and the sale of the above-identified counterfeit tax stamps by JABER and ABUEID to CS1. During the meeting, as captured by the audio recorder, ABUEID, talking about her connection that manufactures the counterfeit tax stamps, stated, "he is a good guy, he brings the programmed disc from a guy who works for the government [the person supplying JABER with fake stamps uses the same template as the real stamps]." ATF agents confirmed that the stamps that JABER and ABUEID sold to CS1 were counterfeit by comparing them to known stamps and noting several differences. Among other things,

known stamps have individual serial numbers and come in rolls, whereas the counterfeit stamps all bore the same serial number and came in sheets.

### E. April 19, 2011: JABER and ABUEID's Purchase of Unstamped Cigarettes and Sale of Counterfeit Tax Stamps

23. On or about April 19, 2011, JABER and ABUEID arrived at the undercover warehouse in separate vehicles. This meeting was recorded with both audio and video. ATF agents had previously provided CS1 with 10 master cases of unstamped cigarettes. According to CS1, during this meeting, JABER and ABUEID negotiated the purchase of 10 master cases of unstamped cigarettes in exchange for $22,800. According to CS1, ABUEID then gave CS1 $7,800 in cash and four manila envelopes containing $14,000 worth of counterfeit Cook County tax stamps.[2] ATF agents then observed CS1 and ABUEID load 6 master cases of unstamped cigarettes into ABUEID's car. ATF agents also observed CS1 and JABER load 4 master cases of unstamped cigarettes into JABER's car. After the meeting, CS1 provided the counterfeit tax stamps and $7,800 in cash to agents. ATF agents confirmed that the stamps that JABER and ABUEID sold to CS1 were counterfeit by comparing them to known stamps and noting several differences, including that the counterfeit stamps all bore the same serial number.

24. On or about April 19, 2011, after the meeting described above, JABER and ABUEID returned to ATF's undercover warehouse. This meeting was recorded with both

---

[2] ATF agents determined after the meeting that ABUEID paid CS1 $1,000 less than was negotiated.

audio and video. ATF agents had previously provided CS1 with 589 cartons of unstamped cigarettes. According to CS1, during this meeting, ABUEID negotiated the purchase of 589 cartons of unstamped cigarettes in exchange for $21,095. According to CS1, JABER then paid CS1 $22,095, which was the agreed upon price plus the $1,000 that JABER and ABUEID had failed to give CS1 earlier that day. According to CS1, during this meeting, JABER told CS1 that she would be placing Florida tax stamps on some of the cigarettes so that they could be sold in Florida. According to CS1, JABER also told CS1 that she would be placing Illinois tax stamps on some of the cigarettes so that they could be sold in Illinois. CS1 and JABER and ABUEID then loaded the cartons of cigarettes into JABER and ABUEID's vehicles, respectively. After the meeting, CS1 provided agents with the $22,095 given to CS1 by JABER.

25. I have reviewed the transcripts of the recorded meeting with JABER and ABUEID. The recording confirmed the sale of the unstamped cigarette cartons to JABER and ABUEID and the sale of the above-identified counterfeit tax stamps by JABER and ABUEID to CS1. The recording also confirmed the information provided to agents by CS1.

F. **May 3, 2011: Purchase of Counterfeit Tax Stamps from ABUEID**

26. On or about May 3, 2011, agents provided CS1 with $10,500, the price which CS1 and ABUEID had previously negotiated for purchase of 35,000 counterfeit Illinois tax stamps during a consensually recorded phone call on or about May 2, 2011. CS1 then traveled to ABUEID's residence. This meeting was recorded with both audio and video.

According to CS1, during this meeting, ABUEID gave CS1 35,000 counterfeit Illinois tax stamps, and CS1 gave ABUEID $10,500. After the meeting, CS1 provided the 35,000 counterfeit tax stamps to agents.

27. I have reviewed the transcripts of this recorded meeting with ABUEID. The recording confirmed the sale of the above-identified counterfeit tax stamps by ABUEID. ATF agents confirmed that the stamps that ABUEID sold to CS1 were counterfeit by comparing them to known stamps and noting several differences. Among other things, known stamps have individual serial numbers and come in rolls, whereas the counterfeit stamps all bore the same serial number and came in sheets.

    **G.    August 9, 2011: JABER's Purchase of Unstamped Cigarettes and Sale of Counterfeit Tax Stamps**

28. On or about August 9, 2011, JABER arrived at the undercover warehouse. This meeting was recorded with both audio and video. ATF agents had previously provided CS1 with 823 cartons of unstamped cigarettes. According to CS1, during this meeting, JABER negotiated the purchase of 823 cartons of unstamped cigarettes in exchange for $19,750. According to CS1, JABER then gave CS1 approximately $17,998 in cash and approximately 5,000 counterfeit Illinois tax stamps worth approximately $1,750. ATF agents then observed CS1 and JABER load the cartons of unstamped cigarettes into JABER's's car. According to CS1, during this meeting, JABER reiterated that she could supply CS1 with cocaine and crack cocaine, but asked CS1 not to tell her sister, ABUEID, about her narcotics

connection. After the meeting, CS1 provided the counterfeit tax stamps and the $17,998 in cash to agents.

29. I have reviewed the transcripts of this recorded meeting with JABER. The recording confirmed the sale of the unstamped cigarette cartons to JABER and the sale of the above-identified counterfeit tax stamps by JABER to CS1. The recording also confirmed that JABER offered to supply CS1 with drugs. ATF agents confirmed that the stamps that JABER sold to CS1 were counterfeit by comparing them to known stamps and noting several differences. Among other things, known stamps have individual serial numbers and come in rolls, whereas the counterfeit stamps all bore the same serial number and came in sheets.

**H.     August 24, 2011: JABER and ABUEID's Purchase of Unstamped Cigarettes and Sample of Cocaine**

30. On or about August 24, 2011, JABER and ABUEID arrived at the undercover warehouse. This meeting was recorded with both audio and video. ATF agents had previously provided CS1 with 1,200 cartons of unstamped cigarettes. According to CS1, JABER removed a clear plastic bag containing suspected cocaine and gave it to CS1. ABUEID was not present in the room when JABER gave the suspected cocaine to CS1. According to CS1, during this meeting, JABER and ABUEID also negotiated the purchase of 1,200 cartons of unstamped cigarettes in exchange for $28,550. According to CS1, JABER then gave CS1 approximately $28,550 in cash, and CS1 loaded both JABER's and ABUEID's vehicles with the unstamped cigarettes. After the meeting, CS1 provided the $28,850 in cash to agents.

14

31. I have reviewed the transcripts of this recorded meeting with JABER and ABUEID. The recording confirmed the sale of the unstamped cigarette cartons to JABER and ABUEID, and the supplying of cocaine to CS1 by JABER. ATF field tested and weighed the suspected cocaine, and it tested positive for containing cocaine and it weighed approximately 2 grams.

### I. August 31, 2011: JABER and ABUEID's Exchange of Approximately 1.4 Kilograms of Cocaine for Unstamped Cigarettes

32. On or about August 24, 2011, JABER and ABUEID arrived at the undercover warehouse in separate vehicles. This meeting was recorded with both audio and video. ATF agents had previously provided CS1 with 1,338 cartons of unstamped cigarettes. According to CS1, during this meeting, JABER provided CS1 with a package of suspected cocaine in exchange for 1,338 cartons of cigarettes. Agents observed this transaction in real time and saw JABER hand CS1 this suspected cocaine. According to CS1, ABUEID then entered the room and gave CS1 $1,440 in exchange for one master case of unstamped cigarettes. ABUEID was not present in the room when JABER gave the suspected cocaine to CS1. During the meeting, as captured by the audio recording, JABER told CS1, "I did ask him [JABER's cocaine supplier] if it's 100% pure, he said no it's 95% [the cocaine is mixed with 5% adulterant]." After the meeting, CS1 provided the $1,440 in cash and suspected cocaine to agents.

33. I have reviewed the transcripts of this recorded meeting with JABER and ABUEID. The recording confirmed the sale of the unstamped cigarette cartons to JABER

15

and ABUEID, and the supplying of cocaine to CS1 by JABER. ATF agents field tested and weighed the suspected cocaine, and it tested positive for containing cocaine and it weighed approximately 1.391 kilograms.

**J.      September 15, 2011: JABER's Distribution of Approximately 1.5 Kilograms of Cocaine to CS1**

34.     On or about September 15, 2011, JABER arrived at the undercover warehouse. This meeting was recorded with both audio and video. ATF agents had previously provided CS1 with 2,430 cartons of unstamped cigarettes. During this meeting, ATF agents observed JABER provide CS1 with a package of suspected cocaine. According to CS1, JABER indicated to CS1 that ABUEID would be by later that afternoon to pick up the unstamped cigarettes, which was being paid for with this cocaine. After this meeting, CS1 gave the suspected cocaine to agents.

35.     On or about September 15, 2011, ABUEID arrived at the undercover warehouse in a rented van. This meeting was recorded with both audio and video. ATF agents then observed CS1, CS2, and ABUEID load approximately 2,430 cartons of unstamped cigarettes into this van. According to CS1, during this meeting, ABUEID told CS1 that she was putting the cigarettes in storage because she was afraid to keep them at home because JABER's husband was recently arrested.

36.     I have reviewed the transcripts of both these recorded meetings. The recordings confirmed the distribution of the cocaine from JABER to CS1 and that ABUEID picked up the cartons of unstamped cigarettes. They also confirmed the information

provided to agents by CS1. ATF agents field tested and weighed the suspected cocaine, and it tested positive for containing cocaine and it weighed approximately 1.540 kilograms.

### K. November 22, 2011: JABER and ABUEID's Exchange of Approximately 1 Kilogram of Cocaine for Unstamped Cigarettes

37. On or about November 22, 2011, JABER and ABUEID arrived at the undercover warehouse in separate vehicles. This meeting was recorded with both audio and video. ATF agents had previously provided CS1 1,620 cartons of unstamped cigarettes. During this meeting, ATF agents observed JABER provide CS1 with a package of suspected cocaine, and according to CS1, he provided JABER with 1,620 cartons of unstamped cigarettes in exchange. ABUEID was not present in the room when JABER gave the suspected cocaine to CS1. During the meeting, as captured by the recording device, JABER told CS1, "I am going to get you 2 kilos. . . [next time.]" Agents observed JABER and ABUEID load the unstamped cigarettes into their vehicles. After the meeting, CS1 provided the suspected cocaine to agents.

38. I have reviewed the transcripts of this recorded meeting with JABER and ABUEID. The recording confirmed the sale of the unstamped cigarette cartons to JABER and ABUEID, and the supplying of cocaine to CS1 by JABER. ATF agents field tested and weighed the suspected cocaine, and it tested positive for containing cocaine and it weighed approximately 1.064 kilograms.

### L. JABER and ABUEID's February 8, 2012 Exchange of Approximately 1 Kilogram of Cocaine for Unstamped Cigarettes

39. On or about February 8, 2012, JABER and ABUEID arrived at the undercover warehouse in separate vehicles. This meeting was recorded with both audio and video. ATF agents had previously provided CS1 with 3,724 cartons of unstamped cigarettes. According to CS1, JABER provided CS1 with a package of suspected cocaine and $45,900 in exchange for 3,274 cartons of cigarettes. ABUEID was not present in the room when JABER gave the suspected cocaine to CS1. After the meeting, CS1 gave agents the suspected cocaine and the $45,900 in cash.

40. I have reviewed the transcripts of this recorded meeting. The recording confirmed the sale of the unstamped cigarette cartons to JABER and ABUEID, and the supplying of cocaine to CS1 by JABER. ATF agents field tested and weighed the suspected cocaine, and it tested positive for containing contain and it weighed approximately 1 kilogram.

### Conclusion

41. Based on the information in this affidavit, there is probable cause to believe that, between in or about December 2010 and in or about February 2012, JABER and ABUEID conspired to (1) purchase and possess contraband cigarettes, namely in excess of 10,000 cigarettes which bear no evidence of the payment of the applicable taxes of the State of Illinois and the County of Cook, Illinois, in violation of Title 18, United States Code, Section 2342(a), and to (2) possess and sell counterfeit tax stamps, in violation of Title 18,

United States Code, Section 2315; all in violation of Title 18, United States Code, Section 371 (Count One); and that, on or about September 15, 2011, JABER knowingly and intentionally distributed a controlled substance, namely, a quantity of a mixture and substance containing a detectable quantity of cocaine, a Schedule II Narcotic Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1) (Count Two).

_____
Daniel Durkin
Special Agent, ATF


SUBSCRIBED AND SWORN TO BEFORE ME
THIS 9th DAY OF MARCH, 2012

_____
Honorable Sheila Finnegan
United States Magistrate Judge